IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 06–cv–01469–EWN–BNB

REINHART OIL & GAS, INC.,

      Plaintiff,

v.

EXCEL DIRECTIONAL
TECHNOLOGIES, LLC,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

      This is a contract dispute.  Plaintiff Reinhart Oil & Gas alleges Defendant Excel Directional Technologies, L.L.C. negligently drilled a directional oil well, causing Plaintiff in excess of $75,000 in damages.  This matter is before the court on "Defendant's Motion to Dismiss," filed August 28, 2006.  Jurisdiction is premised upon 28 U.S.C. § 1332 (2006).

## FACTS

### 1.    *Factual Background*

      Plaintiff is a Texas corporation with its principal place of business in California.  (Compl. ¶ 1 [filed July 28, 2006] [hereinafter "Compl."].)  Defendant is a limited liability company, the sole member of which is a resident of Colorado.  (*Id.* ¶ 2.)  Plaintiff is in the business of oil and gas exploration.  (*Id.* ¶ 5.)  In 2005, Plaintiff became interested in exploring for oil on property in

Montezuma County, Colorado (hereinafter "the Project"). (*Id.* ¶ 6.) Plaintiff, while retaining

fifty-five percent ownership interest in the Project, contracted with Crystal River Oil & Gas,

L.L.C. ("Crystal River") to be the operator of the Project. (*Id.* ¶ 8; Resp. in Opp. to Def.'s Mot.

to Dismiss, Ex. 1 at 5 [Assignment of Claim], Ex. 2 at 1 [Klawiter Aff.] [filed Sept. 21, 2006]

[hereinafter "Pl.'s Resp."].)  RMS Monte Cristo ("RMS"), which is not a party to the present

action, retained an ownership interest of thirty-seven percent  in the Project.[1]  (Pl.'s Resp., Ex. 1

at 5 [Assignment of Claim].)  Crystal River has never held an ownership interest in the Project.

(Pl.'s Resp., Ex. 1 at 1 [Spillane Aff.], Ex. 2 at 2 [Klawiter Aff.].)  Crystal River, as operator of

the Project, hired Defendant to perform directional drilling for the Project.[2]  (Compl. ¶ 11.)

Plaintiff claims that Defendant drilled the well in deviation from Crystal River's instructions.[3]  (*Id.*

¶ 13–14.)  Further, Plaintiff avers that Defendant's negligence resulted in over $75,000 in

damages. (*Id.* ¶ 3.)  Crystal River paid Defendant $38,000 on the Project.  (Pl.'s Resp., Ex. 1 at 2

[Spillane Aff.].)  Plaintiff and RMS, however, were the sources of funds to pay the Project's bills.

(Pl.'s Br., Ex. 1 at 1 [Spillane Aff.], Ex. 2 at 1 [Klawiter Aff.].)  Plaintiff alleges Defendant

demanded an additional $77,160.40, and threatened to file a lien on the Project property upon

nonpayment. (*Id.* ¶ 19.) On July 27, 2006, Crystal River and RMS assigned to Plaintiff all claims

---

[1]The parties have put no evidence before the court regarding what entity owned the other eight percent of the Project.

[2]Directional drilling involves drilling at an angle, which is considered more complicated and difficult than drilling directly downward.  (Pl.'s Resp., Ex. 2 at 2 [Klawiter Aff.].)

[3]Specifically, Plaintiff claims Defendant drilled the well 180 degrees in the wrong direction.  (Compl. ¶ 14.)

against Defendant regarding the Project.  (Pl.'s Resp., Ex. 1 at 5–7 [Assignment of Claim].)
Crystal River forfeited all rights to proceeds from a judgment in Plaintiff's favor; whereas RMS
retained the right to forty percent of the proceeds from any such judgment, roughly reflecting
RMS' ownership interest in the Project.  (*Id.*)

**2.      *Procedural History***

On April 18, 2006, Crystal River filed a complaint against Defendant containing
allegations and claims for relief virtually identical to those made by Plaintiff in the present action.
(*See* No. 1:06-cv-00729-WYD-BNB [Compl. (filed Apr. 18, 2006)].)  On May 30, 2006, Plaintiff
filed an amended complaint to correct an error in naming the parties.  (Am. Compl. [filed May 20,
2006] [hereinafter "Crystal River Am. Compl."].)  On July 17, 2006, Defendant moved to dismiss
the action, arguing that because Crystal River and Defendant are both citizens of Colorado, the
court could not exercise diversity jurisdiction over the matter.  (Def.'s Mot. to Dismiss [filed July
17, 2006].)  Instead of filing a response to Defendant's motion, Crystal River stipulated to
dismissal of the action without prejudice on July 28, 2006.  (Stipulated Mot. to Dismiss Without
Prejudice [filed July 28, 2006].)  That same day, Judge Wiley Y. Daniel entered an order granting
the stipulated motion to dismiss without prejudice.  (Order [filed July 28, 2006].)

Also on July 28, 2006, Plaintiff filed a complaint in this court.  (Compl.)  Plaintiff asserted
two claims against Defendant: (1) negligence by drilling the well 180 degrees in the wrong
direction and by failing to keep Crystal River informed regarding the activities and progress on the
project; and (2) declaratory judgment that Plaintiff is owed no additional money on the Project
and, more specifically, that Plaintiff, as assignee of Crystal River's claims against Defendant, owes

no further payment to Defendant.  (*Id.* ¶¶ 21–28.)  On August 28, 2006, Defendant filed a motion

to dismiss Plaintiff's complaint.  (Def.'s Mot. to Dismiss, filed Aug. 28, 2006 [hereinafter "Def.'s

Br."].)  Defendant argues this court lacks subject matter jurisdiction, because Plaintiff gained its

claim against Defendant through an improper and collusive assignment from a non-diverse party

in violation of 28 U.S.C. § 1359.  (*Id.* at 4–6.)  In the alternative, Defendant argues Crystal River

is an indispensable party to the action that must be joined, which, in turn, would destroy diversity

and require dismissal.  (*Id.* at 6–10.)  On September 21, 2006, Plaintiff responded to the motion.

(Pl.'s Resp.)  On October 4, 2006, Defendant replied in support of its motion.  (Def.'s Reply in

Supp. of Mot. to Dismiss [filed Oct. 4, 2006] [hereinafter "Def.'s Reply"].)  This matter is fully

briefed and ripe for review.

## ANALYSIS

### 1.    *Legal Standard*

Federal courts are courts of limited jurisdiction, empowered to hear only those cases

authorized and defined in the Constitution which have been entrusted to them under a

jurisdictional grant by Congress.  *Henry v. Office of Thrift Supervision*, 43 F.3d 507, 511 (10th

Cir. 1994) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 [1986]) (further

citations omitted).  When a federal court lacks subject matter jurisdiction over a dispute, the court

must remand the action to state court.  28 U.S.C. § 1447(c) (2006).  This rule is inflexible and

without exception, requiring a court to deny jurisdiction in all cases where jurisdiction does not

affirmatively appear in the record.  *Amundson & Assoc. Art Studio, Ltd. v. Nat'l Council on*

*Compensation Ins., Inc.*, 977 F. Supp. 1116, 1120–21 (D. Kan. 1997) (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites*, 456 U.S. 694, 702 [1982]).

Congress created diversity jurisdiction by statute to allow federal courts to entertain suits where the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332 (2006). However, "'[t]he courts must rigorously enforce Congress' intent to restrict federal jurisdiction in controversies between citizens of different states.'" *Martin v. Franklin Capital Corp.*, 251 F.3d 1284, 1289 (10th Cir. 2001) (quoting *Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1339 [10th Cir. 1998]).

Federal Rule of Civil Procedure 12(b)(1) provides that a defendant may move to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1) (2006). "The party invoking jurisdiction bears the burden of establishing such jurisdiction . . . ." *Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1224 (10th Cir. 2004.) A plaintiff "has the duty to support jurisdictional allegations in a complaint by competent proof of the supporting facts if the jurisdictional allegations are challenged by an appropriate pleading." *Pytlik v. Prof'l Res., Ltd.*, 887 F.2d 1371, 1379 (10th Cir. 1989). Moreover, "[w]here a party attacks the factual basis for subject matter jurisdiction, the court does not presume the truthfulness of factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts." *Radil*, 384 F.3d at 1224 (citing *Pringle v. United States*, 208 F.3d 1220, 1222 (10th Cir. 2000).

Here, Defendant challenges jurisdiction based on 28 U.S.C. § 1359, which bars a district court from exercising jurisdiction over "a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such

court." 28 U.S.C. § 1359 (2006) (hereinafter "section 1359" or "§ 1359").  "'This statute is aimed at preventing parties from manufacturing diversity jurisdiction to inappropriately channel ordinary business litigation into the federal courts.'" *Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909, 916 (10th Cir. 1993) (quoting *Yokeno v. Mafnas*, 973 F.2d 803, 809 [9th Cir. 1992]); *see Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 828–29 (1969) (reasoning that collusive assignments could allow "a vast quantity of ordinary contract and tort litigation [to be] channeled into the federal courts at the will of one of the parties").  In essence, "Section 1359 is designed to prevent the litigation of claims in federal court by suitors who by sham, pretense, or other fiction acquire a spurious status that would allow them to invoke the limited jurisdiction of the federal courts." *Nolan v. Boeing Co.*, 919 F.2d 1058, 1067–68 (5th Cir. 1990); *Martinez v. U.S. Olympic Comm.*, 802 F.2d 1275, 1277–80 (10th Cir. 1986) (noting that "sham transactions" aimed solely at creating federal diversity jurisdiction are "condemned by § 1359").  The party asserting jurisdiction bears the burden of demonstrating a diversity-creating assignment was not improper or collusive. *Amoco*, 7 F.3d at 916.  This court is under a duty to dismiss the present action if, at any stage in the proceedings, it becomes apparent that jurisdiction is lacking. *Bradbury v. Dennis*, 310 F.2d 73, 74 (10th Cir. 1962).

**2.    *Evaluation of Claims***

As explained above, Defendant seeks dismissal of Plaintiff's complaint based on this court's lack of subject matter jurisdiction.  (*See* Def.'s Br.)  Specifically, Defendant contends that Plaintiff procured its claim against Defendant by engaging in an improper and collusive assignment in violation of 28 U.S.C. § 1359.  (*Id.* at 4–6.)  Alternatively, Defendant argues

Crystal River is an indispensable party, and, therefore, must be joined in the action, which, in turn, would destroy diversity and necessitate dismissal.  (*Id.* at 6–10.)  I evaluate both claims below.

>    **a.    Subject Matter Jurisdiction**

Defendant contends Crystal River assigned its claim against Defendant to Plaintiff for the sole purpose of creating diversity jurisdiction where it would not otherwise exist, and that such a collusive assignment violates 28 U.S.C. § 1359.  (*Id.* at 4–6.)  Plaintiff counters that the assignment had a legitimate business purpose and would have been made regardless of the effect of gaining a federal forum.  (Pl.'s Resp. at 13–14.)  Specifically, Plaintiff avers that litigation of this case was outside of the scope of Crystal River's duties as operator of the Project and that Plaintiff, as the majority owner of the Project, is the proper party to bring suit.  (*Id.* at 9, 13.)

>    **i.    28 U.S.C. § 1359**[4]

In determining whether an assignment was "improperly or collusively" made, "[w]e start with the presumption against diversity jurisdiction."  *Id.*; *Lehigh Mining & Mfg. Co. v. Kelly*, 160 U.S. 327, 337 (1895) ("[W]hen the inquiry involves the jurisdiction of a Federal court—the presumption in every stage of a cause being that it is without the jurisdiction of a court of the United States, unless the contrary appears from the record.").  The legality of an assignment is not

---

[4]At the outset, the court notes that without the assignment at issue, there would be no diversity in this case.  Crystal River, the sole entity that contracted with Defendant regarding the Project, and thus the party holding all the rights relating to litigation of Defendant's performance on the Project, is a corporation with its principal place of business in Colorado.  (Am. Crystal River Compl. ¶ 1.)  Defendant is a limited liability company, the sole member of which is a resident of Colorado.  (*Id.* ¶ 2.)  Thus, without the assignment to Plaintiff, a Texas corporation with its principal place of business in California, a federal suit based on diversity of citizenship would be impossible.  (*Id.* ¶ 1.)

determinative of whether it violates § 1359. *Kramer*, 394 U.S. at 829 (holding that the otherwise valid assignment of a claim from a non-diverse to a diverse party was collusive under § 1359). Instead, all "[t]ransfers or assignments that have the effect of creating federal jurisdiction raise a red flag and, thus, need to be examined with care." *McCulloch v. Velez*, 364 F.3d 1, 6 (1st Cir. 2004) (citing *Prudential Oil Corp. v. Phillips Petroleum Co.*, 546 F.2d 469, 474 [2d Cir. 1976]). To meets its burden of showing a lack of collusion, a plaintiff must present evidence of a legitimate business purpose for the assignment that is unrelated to the acquisition of federal jurisdiction. *Prudential Oil*, 546 F.2d at 476.

### ii.    *Factors to Consider Under § 1359*

In determining whether an assignment is collusive under section 1359, courts have promulgated several factors for consideration. In *Kramer,* the Supreme Court considered the assignee's previous connection to the claim as well as the amount of interest in the claim retained by the assignor. 394 U.S. at 827–28. Other courts have considered: (1) the timing of the assignment; (2) whether meaningful consideration was given for the assignment; (3) retention of interest in the subject matter of the litigation by assignor; and (4) the underlying motivation behind the assignment. *See, e.g.*, *Land Holdings (St. Thomas) v. Mega Holdings*, 283 F.3d 616, 620 (3d Cir. 2002) (considering retention of interest by assignor, underlying motive, and exchange of consideration); *Airlines Reporting Corp. v. S & N Travel*, 58 F.3d 857, 863–64 (2d Cir. 1995) (considering timing of assignment, exchange of meaningful consideration, and underlying motive); *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 991 (9th Cir. 1994) (considering timing of assignment, pre-existing interest of assignee, underlying motive, and

exchange of meaningful consideration); *Yokeno*, 973 F.2d at 812 (considering underlying motive and exchange of meaningful consideration); *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869, 871 (10th Cir. 1981) (considering underlying motive and the exchange of meaningful consideration).

The U.S. District Court for the Central Division of Utah succinctly and persuasively summarized the factors a court should consider when assessing whether an assignment is collusive. *See Canton Indus. Corp. v. MI-Jack Prods., Inc.*, 944 F. Supp. 853, 856–57 (D. Utah 1996). These factors include:

> "(1) whether and to what extent the assignee has a preexisting financial interest, (2) whether adequate consideration exchanged hands, (3) whether the underlying motivation of the assignment involved a sufficiently compelling business purpose that the assignment would have been made absent the purpose of gaining a federal forum, (4) whether the timing of the assignment supports an inference that the assignment was not entered into to create diversity, (5) whether the assignor has transferred all interest in the litigation, and (6) whether the assignee is financing the litigation."[5]

*Id.* (quoting *Western Farm Credit Bank v. Hamakua Sugar Co., Inc.*, 841 F. Supp. 976, 982 (D. Haw. 1994); *accord Att'ys Trust v. Videotape Computer Prods.*, 93 F.3d 593, 596–97 (9th Cir.

---

[5]The Utah court proposed these factors as appropriate for cases involving a diversity-creating assignment between affiliated parties, in which some courts apply a presumption of collusion. *Id.* (I explore this presumption and its application to the instant action below. [*See Analysis* § 2(a)(iv), *infra*.]) I find these factors are equally appropriate for consideration whenever the legitimacy of an asserted business reason behind an assignment is at issue. In fact, many of the cases I cited above as examples of courts relying on the various factors did not involve an application of the presumption of collusion, including one from this circuit. *See, e.g.*, *Kramer*, 394 U.S. at 827; *Westinghouse*, 645 F.2d at 871. Accordingly, I find these factors may be appropriately considered in all cases requiring a district court to determine whether an assignment is collusive under § 1359.

1996); *Airlines Reporting*, 58 F.3d at 862.  This court adopts the Utah district court's formulation

of the factors to consider when making a section 1359 determination regarding an allegedly

collusive assignment.  The caselaw establishes that a court should analyze these factors under the

totality of the circumstances.  *See, e.g.*, *Yokeno*, 973 F.2d at 810 (stating that in performing a §

1359 analysis "the district court must delve deeper into the totality of the circumstances

surrounding the assignment").

### iii.     Underlying Motive as a Factor

To support its contention that the assignment at issue was collusive, Defendant relies

heavily on evidence of Plaintiff's motive underlying the assignment.  (*See* Def.'s Br. at 4, 6; Def.'s

Reply at 3–7.)  Yet, the importance of motive in the totality of circumstances is an unresolved

issue in this circuit, and there is some divergence among other courts regarding the significance of

the motive.  JAMES MOORE, 15 FEDERAL PRACTICE § 102.19[4][a] (3d ed. 1997); *Att'ys Trust*, 93

F.3d at 569 ("There is some doubt that the subjective 'motive' element is entitled to great

weight."); *Haskin v. Corporacion Insular de Seguros*, 666 F. Supp. 349, 354 (D.P.R. 1987)

(noting "a split among the Circuits . . . concerning the weight that should be accorded to the

motive factor").  For instance, while the Second Circuit seems content to focus its section 1359

inquiry on the "primary purpose" behind an assignment, the Ninth Circuit suggests that

consideration of subjective motive is usually secondary to objective factors which can shed light

on the "reality of the transaction."  *Compare Airlines Reporting*, 58 F.3d at 862 (holding "we

construe section 1359 broadly to bar any agreement whose 'primary aim' is to concoct federal

diversity jurisdiction") *with Att'ys Trust*, 93 F.3d at 597 (noting that "[w]hile courts are interested

in motive because it can shed a great deal of light on otherwise ambiguous circumstances and can be virtually controlling in some situations, the main focus is usually upon the reality of the transaction itself").

This circuit's caselaw suggests that subjective motive is, at most, of secondary importance to objective factors. In *Bradbury*, for instance, the Tenth Circuit found an assignment that was clearly "infected with self dealings" and intended to obtain a federal forum, was nevertheless proper because the "assignment was supported by adequate consideration, and . . . there was nothing surreptitious or fictitious about the transaction." 310 F.2d at 76. In *Bradbury*, a Colorado corporation assigned its claims to its nonresident stockholder in order to create diversity; yet, it did not appear that the corporation was dissolved or that it really divested itself of any interest in the claims. *Id. Bradbury* has been criticized as out of step with the goals of section 1359, because the court found a transaction that was engaged in for the sole purpose of creating diversity jurisdiction where it would not have otherwise existed to be proper under section 1359. *See Caribbean Mills, Inc. v. Kramer*, 392 F.2d 387, 391–92 (5th Cir. 1968), *aff'd*, *Kramer*, 394 U.S. 823; *Fowler v. Coals*, 418 F. Supp. 909, 912 (D. Tenn. 1976).

Since *Bradbury*, the Tenth Circuit has displayed only a somewhat increased interest in motive. In *Westinghouse*, the court did consider the "purpose behind" an allegedly collusive assignment. 645 F.2d at 871; *see also Amoco*, 7 F.3d at 916–17 (considering the purpose behind an allegedly collusive pre-litigation agreement). This circuit has also considered motive in the analogous circumstance of a purportedly collusive appointment of an estate administrator in violation of § 1359. *Hackney v. Newman Mem'l Hosp.*, 621 F.2d 1069, 1071 (10th Cir. 1980).

In *Hackney*, where there was substantial evidence that the administrator was appointed at least in part to establish diversity, the court found motive was not controlling because the administrator had a "real, substantive stake in the litigation" prior to being appointed. 621 F.2d at 1071. The Tenth Circuit later explained that in *Hackney*:

> we held that the appointment of a fiduciary who had a substantial beneficial interest in the litigation being conducted was immune from challenge under § 1359. In essence we held in *Hackney* that an heir's beneficial interest in the outcome of the litigation kept the appointment from being a sham transaction condemned by § 1359.

*Martinez*, 802 F.2d at 1279. Ultimately the court decided that rather than "provide an opportunity for delay tactics by defendants and force trial courts to hold hearings upon subjective motivations that would be time consuming and extremely difficult to resolve," it is preferable to "make immune from challenge, for diversity purposes, an appointment of a fiduciary who has a substantial beneficial interest in the litigation being conducted." *Hackney*, 621 F.2d at 1071.

The Tenth Circuit, however, reluctantly found it should inquire into motive when an appointee had no personal economic stake in the litigation. *Martinez*, 802 F.2d at 1279 ("While we would prefer to avoid time-consuming hearings on difficult-to-resolve issues of subjective motivation, we agree . . . that the language of § 1359, denying jurisdiction when a party has been made or joined 'to invoke' jurisdiction, requires inquiry into motive for the appointment in cases in which the appointee does not have a personal economic stake in the litigation."). By analogy, these cases suggest two important premises.

### (1)    Subjective Motive is Secondary to Objective Factors

First, *Hackney*, by analogy, suggests that when considering whether the totality of the circumstances supports a finding that the assignment was collusive, subjective motive behind the assignment is at best of secondary importance to objective factors.  The objective factors noted above help focus the court's inquiry on: (1) the reality of the transaction, and (2) whether real and substantial parties to the controversy are before the court.  Such considerations are likely to prove far more fruitful, and to keep litigation outcomes far more consistent, than any inquiry that focuses on subjective motive.  *See Land Holdings*, 283 F.3d at 619 ("Case law makes clear that the legitimacy of the transfer or assignment of a mortgage is a far more important factor in determining whether jurisdiction was collusively manufactured than is the motive of the parties for the assignment.")  For instance, when an assignor retains no interest in or control over the litigation and when meaningful consideration is given for the assignment, these objective factors suggest the assignment was "real" and not a sham transaction.  *See Att'ys Trust*, 93 F.3d at 597 (noting that "[w]hile courts are interested in motive because it can shed a great deal of light on otherwise ambiguous circumstances and can be virtually controlling in some situations, the main focus is usually upon the reality of the transaction itself").  Also, when an assignee has a substantial pecuniary interest in the outcome of the litigation and funds the litigation, it is likely that the assignee is a real and substantial party to the controversy.  This is important because federal courts are limited to resting diversity jurisdiction only upon the citizenship of "real and substantial parties to the controversy."  *Navarro Sav. Ass'n v. Lee*, 466 U.S. 458, 460–61 (1980); *see Cunningham v. BHP Petroleum Gr. Brit. PLC*, 427 F.3d 1238, 1244 (10th Cir. 2005) (citing *Becker v. Angle*, 165 F.2d 140, 142 [10th Cir. 1947] ["[I]n determining the question of diversity

-13-

we look to the citizenship of the real parties in interest."]).   An assignee who had a substantial

beneficial interest in the litigation prior to the assignment is a real and substantial party to the

controversy.   Such an interest is an appropriate, objective factor on which a court may rely

heavily in determining whether an assignment violates § 1359.   *See Att'ys Trust*, 93 F.3d at 596

("The objective fact of who really is the party in interest is the most important thing to be

determined."); *Haskin*, 666 F. Supp. at 354 (holding motive is "relevant," but not "controlling,"

and should be accorded "less weight than the determinations of whether the assignment was real

or colorable and, most important, whether or not the assignee has a some independent, pre-

existing legitimate interest in the cause of action assigned to him").   Based on the foregoing, I find

that in a section 1359 analysis, this court's inquiry into the motive behind the assignment is of

secondary importance to its inquiry into objective factors that establish the reality of the

transaction and whether real and substantial parties to the controversy are before the court.

### *(2)      When Subjective Motive May be Wholly Irrelevant*

Second, *Hackney*, by analogy, suggests that the subjective motive behind an assignment

may be wholly irrelevant when an assignor has a substantial pecuniary interest in the outcome of

the litigation.   This second point brings up some complex issues.   Before *Kramer*, a number of

Supreme Court cases suggested a rule that the underlying motive behind a diversity-creating

assignment need not be inquired into when the transfer of the claim was complete and absolute

and the transferor retained no interest in the subject matter.   *See Brown & Yellow Taxicab Co. v.*

*Brown & Yellow Taxicab Co.*, 276 U.S. 518 (1928); *South Dakota v. North Carolina*, 192 U.S.

286 (1904); *Cross v. Allen*, 141 U.S. 528 (1891).   In such cases, the Court found the assignment

essentially immune from attack under § 1359, regardless of the motive behind the assignment. The *Kramer* court explicitly left open the question of whether this bright-line rule survived the Court's decision.  394 U.S. at 898 n.9.  That question has yet to be directly addressed by this circuit, but the bright-line rule established in the analogous case of *Hackney* may be argued to signal the Tenth Circuit's willingness and even desire to establish a bright-line rule that would allow district courts to avoid inquiries into the subjective motives behind assignments.  *See Hackney*, 621 F.2d at 1071.

Although there are persuasive arguments that *Hackney* is distinguishable from the bright-line rule mentioned in *Kramer*,[6] I find it is unnecessary to reach the continuing viability of the rule in the instant order.  Even if the bright-line rule noted in *Kramer* were adopted by this circuit, I find that such a rule would have to give way when the assignment at issue was between closely affiliated parties.  As is discussed in detail below, most courts that have considered the issue subject such assignments to heightened scrutiny, reflecting concerns that when an assignment is between affiliated organizations, it may appear that the assignor transferred all interest in the claim when, in reality, the assignor retained a substantial pecuniary interest because of the close relationship between the parties.  *See, e.g.*, *Prudential Oil*, 546 F.2d at 475–76 ("[W]hen a

---

[6]Briefly, *Hackney* may be distinguishable because of its focus on the interest of the assignee, as opposed to *Kramer's* focus on the interest of the assignor.  It is not clear to this court that a transferor's lack of retention of an interest in the outcome of litigation after an assignment is as persuasive on the question of collusion as a transferee's legitimate and substantial pre-existing pecuniary interest in the outcome of the litigation.  Although a lack of retention of interest suggests that the assignment may have been a "real" transaction, it does not guarantee that the parties before the court are real and substantial parties to the controversy.  *See Navarro*, 466 U.S. at 460–61.

wholly-owned subsidiary assigns a claim to its parent, just as in the reverse situation, the same set

of stockholders running both corporate forms can transfer title to that claim freely between them.

In each case the transferor, whether it is the parent or the subsidiary, realistically retains a

substantial pecuniary interest in the outcome of the litigation which it assigns to the other.").  This

heightened scrutiny is alternatively referred to as a presumption of collusion, and when it is

applicable, even the bright-line rule referred to in *Kramer* must give way, so as to allow the court

to determine whether, even though it appears the assignment was complete and absolute, the

transaction was actually a sham in violation of § 1359.  *See Att'ys Trust*, 93 F.3d at 596 ("While

motive can often be important, if the assignment is truly absolute and complete, motive often

recedes into almost nothing.  However, even when there is a complete assignment, collusion may

be found.  That is most likely to be where there is an excellent opportunity for manipulation . . .

.") (citations omitted).  Based on the foregoing and because, as discussed in detail below, I find

the assignment in the instant action is subject to a presumption of collusion, I need not decide

whether to adopt the bright-line immunity rule referred to in *Kramer*.

### iv.   *Presumption of Collusion*

As alluded to above, the level of scrutiny with which the factors considered in a § 1359

inquiry are analyzed may depend on the nature of the relationship between the assignor and the

assignee.  Several courts have found that diversity-creating assignments between certain closely-

affiliated parties are due elevated scrutiny.  *See, e.g.*, *Prudential Oil*, 546 F.2d at 475–76.

Defendant contends the assignment of claims from Crystal River to Plaintiff should be

subject to a presumption of collusion for two reasons.  (Def.'s Br. at 5–6.)  First, both Crystal

-16-

River and Plaintiff share a common owner. (*Id.* at 5.) Reiner W. Klawiter is the sole owner of

Plaintiff Reinhart Oil & Gas, Inc. (*Id.*, Ex. 5 [Pl.'s Corporate Filing].) He is also one of two

members of Crystal River, a limited liability company. (*Id.*, Ex. 6 [Crystal Rivers' Corporate

Filing].) Defendant argues that as a result of this common ownership, "Mr. Klawiter can easily

transfer the claim, or its proceeds if there are any, back and forth between Crystal River and

[Plaintiff] at his convenience." (*Id.* at 5–6.) Second, Defendant claims that the relationship

between Plaintiff as owner of the Project and Crystal River as operator of the Project supports a

"presumption that the parties share a pecuniary interest in the outcome of this litigation regardless

of which one of them holds the claim." (*Id.* at 6.) Plaintiff counters that although the two entities

do have an owner in common, the companies are not in a parent-subsidiary relationship, nor do

they have the same business purpose, records, or financial accounts, and thus the assignment

should not be presumed collusive. (Pl.'s Resp. at 10–11.)

Courts have applied a presumption of collusion to assignments between a variety of

affiliated parties. All courts that have applied the presumption agree that assignments between

parent and subsidiary corporations are generally suspect because of the perceived ease of

collusion between entities with common owners and shared pecuniary interests. *Prudential Oil*,

546 F.2d at 476 (applying heightened scrutiny to a diversity-creating assignment between a parent

and a subsidiary corporation based on both common ownership between the two entities and the

fact that the assignee "realistically retains a substantial pecuniary interest in the outcome of the

litigation which is assigned to the other"); *see Nike*, 20 F.3d at 991 (applying presumption of

collusion to assignment by a subsidiary to a parent corporation). This presumption has been

-17-

extended to assignments between other affiliated parties, including: (1) assignments between corporations and their officers or directors, *see, e.g.*, *Yokeno*, 973 F.2d at 809–10; (2) assignments between corporate directors and shareholders, *McCulloch*, 364 F.3d at 6; *Airlines Reporting*, 58 F.3d at 862–63; (3) an assignment to a company which funds assignor as well as wields significant decision-making authority over assignor, *Western Farm*, 841 F. Supp. at 982; and (4) assignments between trustees, *Syms v. Castleton Indus., Inc.*, 470 F.2d 1078, 1079 (5th Cir. 1972).

This circuit has not yet considered whether application of the presumption of collusion is proper when affiliated parties engage in a diversity-creating assignment, although at least one district court in this circuit has applied the presumption to such an assignment. *See Canton Indus.*, 944 F. Supp. at 856. The Seventh Circuit is the only circuit that has considered application of the presumption and declined to apply it. *See Herzon Contracting Corp. v. McGowen Corp.*, 976 F.2d 1062, 1067 (7th Cir. 1992). In *Herzon*, the court concluded that if Congress had wanted to adopt such a presumption, it would have done so in the statute. *Id.* For the reasons set forth below, I am persuaded by the Second Circuit's reasoning in *Prudential Oil* that the presumption is appropriate given: (1) the purpose of section 1359, and (2) the Supreme Court's opinion in *LeHigh Mining & Mfg. v. Kelly*, 160 U.S. 327 (1895).

The Supreme Court addressed the purpose behind § 1359 in *Kramer*, explaining:

> If federal jurisdiction could be created by [collusive assignments between affiliated parties], which are easy to arrange and involve few disadvantages for the assignor, then a vast quantity of ordinary contract and tort litigation could be channeled into the federal courts at the will of one of the parties.  Such manufacture of Federal jurisdiction was the very thing which Congress intended to prevent when it enacted § 1359 . . . .

*Kramer*, 394 U.S. at 828–29 (internal quotations omitted).  As the Second Circuit further explained:

> The scrutiny normally applied to transfers or assignment of claims which have the effect of creating diversity must be doubled in the case of assignments between related or affiliated corporations since common ownership . . . only serves to increase the possibility of collusion and compound the difficulty encountered in detecting the real purpose of the assignment.

*Prudential Oil*, 546 F.2d at 475; *see Airlines Reporting*, 58 F.3d at 863 (finding transfer of legal title to claims between affiliated parties "can easily be arranged, increasing the potential for collusion and compounding the difficulty in detecting the true purpose for the assignment"). Moreover, a close relationship between assignor and assignee "necessarily presents opportunities for the collusive manufacture of commercial reasons for the assignment."  *Nike*, 20 F.3d at 991 (internal quotations omitted).  A presumption of collusion, then, "serves a useful purpose by aiding in 'the difficult task of distinguishing genuine from sham transfers between closely related entities.'" *Airlines Reporting*, 58 F.3d at 862 n.5 (quoting *Prudential Oil*, 546 F.2d at 475). Ultimately, I am persuaded that applying a presumption of collusion when assessing assignments between closely affiliated entities properly aids the court in ferreting out improper assignments under § 1359.

Secondarily, as the Second Circuit stated in *Prudential Oil*, "It was suggested by the Supreme Court almost a century ago that an intercorporate assignment between a parent and its subsidiary should be treated as presumptively ineffective for jurisdictional purposes." 546 F.2d at 475 (citing *Lehigh Mining*, 160 U.S. 327). In *Lehigh*, the Supreme Court dismissed the action for lack of jurisdiction when a Virginia corporation transferred title to a Pennsylvania corporation and then claimed diversity in a Virginia federal court. 160 U.S. 327. The Court explained:

> It is true that the technical title to the lands in controversy is, for the time, in the Pennsylvania corporation. It is also true that there was no formal agreement upon the part of that corporation . . . that the title should ever be reconveyed to the Virginia corporation. But when the inquiry involves the jurisdiction of a Federal court—the presumption in every stage of a cause [is] that it is without the jurisdiction of a court of the United States, unless the contrary appears from the record.

*Id.* Based on the foregoing, I conclude that diversity-creating assignments between closely affiliated parties are subject to a presumption of collusion, which requires the court to apply heightened scrutiny to the factors considered in a § 1359 determination. However, in deviation from the expressed focus of some other courts that have considered the issue,[7] and as was

---

[7]When the presumption of collusion is not applicable, most courts have held that the party asserting diversity need proffer only a plausible business reason for the assignment and need not prove the assignment would have been sought even without the effect of obtaining a federal forum. *See, e.g.*, *Yokeno*, 973 F.2d at 811; *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 195 (2d Cir. 2003). Further, when no presumption applies, these courts generally have found the existence of a dual motive—both a legitimate business purpose as well as a desire to obtain a federal forum—does not render the assignment ineffective for diversity purposes. *See, e.g.*, *Yokeno* 973 F.2d at 811; *Western Farm*, 841 F. Supp. at 981 ("If a party puts forth a legitimate business purpose, the assignment will not be rendered ineffective for diversity jurisdiction even when the assignment was partially motivated by a desire to create diversity.").

Courts that have applied this presumption, however, have demanded that the party asserting diversity do more than articulate a facially legitimate business reason for the diversity-

discussed above, the subjective underlying purpose behind the assignment should not be the primary focus of the § 1359 inquiry.  (*See Analysis* § 2[a][iii], *supra*.)  Instead, the court should focus its attention on objective factors that suggest whether or not the assignment at issue was a real transaction and whether the diversity-asserting party is a real and substantial party to the controversy.  (*Id.*)

In the instant action, I find that Crystal River and Plaintiff are associated in such a way as to justify application of a presumption of collusion.  As discussed above, those circuits that apply a presumption of collusion do so almost automatically in the case of an assignment between a parent corporation and its subsidiary.  *See, e.g., Nike*, 20 F.3d at 991.  These courts generally justify application of the presumption based on two considerations: (1) common ownership between the entities; and (2) the assignee's realistic retention of substantial pecuniary interest in the outcome of the litigation, in spite of the fact that the assignee has technically transferred all rights to the claim.  *See, e.g., Prudential Oil*, 546 F.2d at 475–76.  Some courts have expanded the presumption to encompass assignments between corporate directors and shareholders as well

---

creating assignment.  "Instead, the burden falls on [that party] to demonstrate that the reason given for the assignment is legitimate, not pretextual."  *Airline Reporting*, 58 F.3d at 863; *Nike*, 20 F.3d at 991–93; *Yokeno*, 973 F.2d at 810; *Dweck v. Japan CBM Corp.*, 877 F.2d 790, 792–93 (9th Cir. 1989); *Prudential Oil*, 546 F.2d at 475.  In ferreting out the legitimacy of the asserted business reason, many courts focus their inquiry on whether the assignment would have been made absent the purpose of gaining a federal forum.  *See, e.g., Airlines Reporting*, 58 F.3d at 862 (stating "we construe section 1359 broadly to bar any agreement whose 'primary aim' is to concoct federal diversity jurisdiction"); *Nike*, 20 F.3d at 992 (quoting *Yokeno*, 973 F.2d at 811) ("[S]imply showing a colorable or plausible business reason for the assignment will no longer suffice. . . .  'The business reasons must be sufficiently compelling that the assignment would have been made absent the purpose of gaining a federal forum.'").

as trustees.  *See, e.g.*, *Dweck*, 877 F.2d at 792.  *Blythe Industries, Incorporated v. Puerto Rico Aqueduct & Sewer Authorit*y, 573 F. Supp. 563 (D.P.R. 1983), presents an application of the presumption to facts more analogous to the instant case.  In *Blythe,* two corporations, Blythe Industries and Vanguard Constructions Corporation, as joint-venturers, owned Blythe-Vanguard Construction Corporation.  This corporation was formed for the sole purpose of performing construction for the Puerto Rico Aqueduct & Sewer Authority.  *Id.*  A dispute arose between Blythe-Vanguard and the Authority.  Seven months before suit was filed, Blythe-Vanguard assigned its claims to its owners.  Because of "the close relationship between assignor and assignees and the facility with which this type of assignment is made," and because no legitimate reason for the transfer was demonstrated, the court found the assignment by the corporation to its owners collusive.  *Id.* at 564.  Similarly, in *Western Farm*, the U.S. District Court fo the District of Hawaii applied a presumption of collusion based on the assignee's: (1) possession of significant decision making authority over assignor; (2) funding of assignor; and (3) the fact that the assignor's liquidity and ability to remain in business depended upon the assignee's funding.  841 F. Supp. at 982.  These cases are grounded in the theory that the more closely aligned the interests of the two entities are, the more likely they are to collude in order to improperly create diversity, and the more difficult discovering such collusion will be.

Although I consider it a close question, I find on the record before me that the "close ties" between Plaintiff and Crystal River "trigger the presumption of collusion in this case."  *Airlines Reporting*, 58 F.3d at 862–63.  I agree with the Second Circuit that "common ownership," as it exists between these two entities, "only serves to increase the possibility of collusion and

compound the difficulty encountered in detecting the real purpose of the assignment." *Prudential Oil*, 546 F.2d at 475.  Although it is not clear that the assignor, in this case, realistically retains a substantial pecuniary interest in the outcome of the litigation, "[a]s with assignments between parent and subsidiary companies, the transfer of legal title to the claims between the parties [in the instant action] can easily be arranged." *Airlines Reporting*, 58 F.3d at 863.  Moreover, Plaintiff admits that it and Crystal River's "interests are one and the same."  (Pl.'s Resp. at 7.)  It is just such an "identity of corporate interests" that tips the scales to allow this court to apply a presumption of collusion.  *See Airlines Reporting*, 58 F.3d at 863.  Plaintiff and Crystal River's shared interest and close relationship "necessarily present[] opportunities for collusive manufacture of commercial reasons for the assignment." *Nike*, 20 F.3d at 991.  Thus, this court must endeavor to consider the factors discussed above under heightened scrutiny and determine whether, under the totality of the circumstances, the assignment at issue was improper or collusive in violation of section 1359.  The focus of this inquiry will be on objective factors that suggest whether the assignment was a real transaction and whether real and substantial parties to the controversy are before the court.  (*See Analysis* § 2[a][iii], *supra*.)

> ### v. *Application of the Factors*

As discussed above, in determining whether the assignment at issue is collusive under section 1359, I will consider the following factors under the totality of the circumstances:

"(1) whether and to what extent the assignee has a preexisting financial interest, (2) whether adequate consideration exchanged hands, (3) whether the underlying motivation of the assignment involved a sufficiently compelling business purpose that the assignment would have been made absent the purpose of gaining a federal forum, (4) whether the timing of the assignment supports an inference that the

assignment was not entered into to create diversity, (5) whether the assignor has transferred all interest in the litigation, and (6) whether the assignee is financing the litigation."

*Canton Indus.*, 944 F. Supp. at 856–57 (quoting *Western Farm*, 841 F. Supp. at 982).  (*See Analysis* § 2[a][ii], *supra*.)  I address the factors in turn, emphasizing that because a presumption of collusion applies in the instant action, the factors must weigh heavily in Plaintiff's favor.[8]  (*See id.* § 2[a][iv], *supra*.)

### *(1)   Assignee's Preexisting Financial Interest*

An assignee without a preexisting financial interest in the outcome of the litigation will almost certainly be considered a strawparty, rendering the assignment collusive and in violation of § 1359.  *See U.S.I. Properties*, 860 F.2d at 6 (finding reliance on a "strawman, or sham transactions, solely for the creation of otherwise unobtainable jurisdiction" is violative of § 1359); *Martinez*, 802 F.2d at 1279 (finding an appointment collusive based, in part, on the appointee's lack of any "beneficial interest in the litigation"); *Hackney*, 621 F.2d at 1071 (finding no collusion "[b]ecause plaintiff has a real, substantive stake in the litigation," and thus "is not a straw party").  As discussed above, this factor ensures that the party asserting diversity is a real and substantial party to the controversy, as required by Supreme Court precedent.  (*See Analysis* § 2(a)(iii)(2), *supra*.)  In the instant case, there can be no doubt, and Defendant does not contest, that Plaintiff had a substantial preexisting beneficial interest in the outcome of the litigation.  In fact, it appears

---

[8]Defendant does not directly address each of the factors, and in fact focuses almost exclusively on the motive underlying the assignment.  Accordingly, my discussion of some factors necessarily does not include arguments by Defendant.  (*See* Def.'s Br. *passim*; Def.'s Reply *passim*.)

Plaintiff, as majority owner of the Project, is the entity with the single greatest preexisting

financial interest in the outcome of the litigation.  (*See* Pl.'s Resp. at 11–12.)  Thus, this court is

satisfied that the parties before the court are real and substantial parties to the controversy.

### *(2)     Whether the Assignor has Transferred All Interest in the Litigation*

When an assignor retains significant interest in the outcome of the litigation, a court is

almost certain to find the assignment was not a real transaction, and was in fact a sham, and thus

violative of § 1359.  *See Kramer*, 394 U.S. at 824 (finding a violation of § 1359 when assignment

of claim was accompanied by simultaneous reassignment of ninety-five percent interest in the suit

back to the assignor); *Land Holdings*, 283 F.3d at 619 (noting that transferor's lack of retention

of interest in subject matter of an absolute assignment is dispositive on issue of § 1359 collusion).

In the instant action, Crystal River unequivocally relinquished all its rights to any claims against

Defendant regarding the Project.  (*See* Pl.'s Resp., Ex. 1 at 5–6 [Assignment of Claim].)  The

assignment agreement states:

> [Plaintiff] has or has the right to hereafter acquire all right, title and interest in all
> of Crystal River's legal claims which may arise in the [d]ispute, including without
> limitation claims against [Defendant].  By this Assignment, Crystal River . . .
> hereby irrevocably and forever sell[s], transfer[s], convey[s], and assign[s] to
> [Plaintiff] any and all of such right, title or interest in Crystal River's and
> [Plaintiff's] claims.

(*Id.*)  Further, the agreement states that RMS will receive forty percent of any net recovery from

the litigation, but fails to make mention of any recovery by Crystal River.  (*Id.*)  Thus, it appears

from the evidence before the court that Crystal River retains no financial interest in the outcome

-25-

of this litigation.[9]  (*See* Pl.'s Resp. at 15 ["Crystal River [is] without an interest in the potential

proceeds from the litigation."].)

  Although I have found Plaintiff and Crystal River are closely affiliated, the assignment at

issue is distinguishable from assignments between parent corporations and their subsidiaries, as

well as between corporations and their directors or stockholders.  In an assignment involving

those entities, the assignee "realistically retains a substantial pecuniary interest in the outcome of

the litigation which is assigned to the other," because of the nature of the corporate structure,

which establishes closely intertwined financial interests between each entity.  *See Prudential Oil*,

546 F.2d at 476; *Nike*, 20 F.3d 992.  Here, there is no corporate structure that inevitably

intertwines the financial interests of Crystal River and Plaintiff to a degree that cannot be undone

by even an absolute assignment.  Plaintiff is a corporation and Crystal River is a limited liability

company in which Plaintiff is not a member.  (Pl.'s Resp. at 10.)  Although common ownership

between the two companies suggests a close affiliation, I find that common ownership alone is

insufficient to prove that even a complete assignment results in the realistic retention of interest in

the subject matter of the litigation by the assignee.

  This is particularly true when the assignment is from the operator to the majority owner of

the Project.  If the tables were turned, and the majority owner of the Project transferred its rights

in the claim to the operator of the Project, there would be a much stronger argument that even

---

[9]Defendant suggests that Plaintiff may surreptitiously transfer the proceeds of any claim
back to Crystal River, (*see* Def.'s Br. at 5), but this court will not presume such a dark motive
even between affiliated entities without some evidentiary support, particularly when Plaintiff has
put forth documentary evidence that Crystal River retains no right to any recovery from the suit.

after the transfer, the assignee realistically retained a substantial pecuniary interest in the outcome

of the litigation.  After all, it was the owners' money that was at stake in this Project all along.

According to the evidence before the court, however, it is questionable if Crystal River *ever* had a

substantial pecuniary stake in the outcome of the litigation.  Certainly, as operator, it had an

interest in the correct completion of the project, but there is no evidence before the court that

Crystal River, in reality, had any of its own money tied up in the Project.  (*See* Pl.'s Resp., Ex. 1

at 1 [Spillane Aff.] [stating Plaintiff and RMS were "the owners and source of funds to pay the

Project's [bills]"], Ex. 2 at 1 [Klawiter Aff.] [same].)  Based on the foregoing, I conclude that

Crystal River retains no meaningful interest in the outcome of this litigation.

### (3)       *Whether the Assignee is Financing the Litigation*

If after assigning a claim, the assignee seeks to retain control over or finances the

litigation, this militates in favor of a finding of collusion, as the transfer of the claim was likely a

sham.  *See Yokeno*, 973 F.2d at 810; *Haskin*, 666 F. Supp. at 354–56 (noting that courts consider

the continued control and financing by assignee of the litigation).  Here, the assignment agreement

shows, and Defendant does not contest, that Crystal River has retained no control over the

litigation and will not be financing the effort.  (Pl.'s Resp, Ex. 1 at 5–6 [Assignment of Claim].)

The only remaining involvement of Crystal River in the present lawsuit is its agreement to provide

further assurances regarding the assignment as well as to cooperate with Plaintiff in the litigation.

(*Id.*)  Such involvement does not denote any type of retained control over the litigation by Crystal

River.  Thus, I find this factor militates against a finding of collusion.

### (4)       *Consideration*

A diversity-creating assignment that lacks meaningful consideration will strongly suggest that the assignment was a sham transaction in violation of section 1359. *See Kramer*, 394 U.S. at 824 (finding collusion in violation of § 1359 when diversity creating assignment was made for consideration of one dollar); *Dweck*, 877 F.2d at 793 (finding collusion, in part, based on lack of consideration for appointment). Although Defendant does not address the point, Plaintiff argues adequate consideration exchanged hands. (Pl.'s Resp. at 12–13.) Here, in exchange for Crystal River's rights to its claims against Defendant regarding the Project, Plaintiff "agreed to carry the costs and expenses of the suit." (*Id.* at 12.)

Plaintiff avers, and Defendant does not dispute, that Crystal River, as operator of the Project, faced no financial risk regarding the Project. (*Id.* at 5.) Plaintiff and RMS were the source of all funds for the Project, implicitly including any monies paid by Crystal River to Defendant. (*Id.*, Ex. 1 at 1 [Spillane Aff.], Ex. 2 at 1 [Klawiter Aff.].) Any suit by Crystal River against Defendant would, thus, essentially be a suit on behalf of the owners of the Project. (*See id.* at 5.) Still, as operator of the Project, and the only party clearly in privity of contract with Defendant, the responsibility to make the owners of the Project whole seemed to fall in Crystal River's lap. Moreover, the operating agreement between Plaintiff and Crystal River explicitly states that the "costs and expenses of handling" litigation over the Project "shall be at the joint expense of the parities participating in the operation from which the claim or suit arises." (Def.'s Reply, Ex. 1 at 16 [Operating Agreement].) Thus, according to this agreement, Crystal River had an obligation to help cover the costs of litigation arising from breach of its contract with Defendant. (*See id.*)

Here, Plaintiff offered to take the financial and temporal responsibility off Crystal River's lap. Such an offer would be of value to Crystal River, because Crystal River possessed little, if any, likelihood of financial gain from a lawsuit, as it was in reality Plaintiff's, not Crystal River's, money that was at stake in the dealings with Defendant over the Project. (*See* Pl.'s Br., Ex. 1 at 1 [Spillane Aff.], Ex. 2 at 1 [Klawiter Aff.].) Thus, as a result of the assignment, Plaintiff gained the right to control a lawsuit involving a project in which it had majority ownership, while Crystal River gained relief from the time, labor, and expense of litigation that promised it virtually no monetary returns. Based on the foregoing, I find meaningful consideration exchanged hands for the assignment at issue.

### (5)   *Whether the Underlying Motivation for the Assignment was to Gain a Federal Forum*

Some courts view the primary purpose behind an allegedly collusive assignment as central to a section 1359 inquiry subject to heightened scrutiny. *See, e.g.*, *Nike*, 20 F. 3d at 992 ("[O]ur primary inquiry is whether the assignment would have been made absent the purpose of obtaining a federal forum."). As discussed above, in making a § 1359 determination, this circuit's reliance on motive as evidence of collusion is secondary to its reliance on objective factors which help the court assess the reality of the transaction as well as whether real and substantial parties to the controversy are before the court. (*See Analysis* § 2[a][iii], *supra*.)

Plaintiff asserts it had a legitimate business reason for the assignment, disconnected from the acquisition of a federal forum. In essence, Plaintiff argues it was not Crystal River's job, as operator of the Project, to undertake a complex, expensive, and involved litigation on behalf of

the owners of the Project.  (*See* Pl.'s Resp. at 13–14.)  According to Plaintiff, Crystal River's

duties were limited to hiring, firing, contracting with subcontractors, payroll, and the ability to

pursue litigation regarding the Project if the amount of exposure did not exceed $10,000.  (*Id.* at

13, Ex. 1 at 2–3 [Spillane Aff.], Ex. 2 at 2–3 [Klawiter Aff.].)  Plaintiff claims that when Crystal

River initially filed suit against Defendant, it was expected that Defendant would allow entry of a

default judgment.  (*Id.*, Ex. 1 at 3 [Spillane Aff.], Ex. 2 at 3 [Klawiter Aff.].)  When Defendant

responded to the complaint, Plaintiff argues the potential for expensive and complex litigation

increased, leading Plaintiff to seek assignment of Crystal River's claims against Defendant, so that

Plaintiff could prosecute the action itself.  (*Id.* at 13–14, Ex. 1 at 3 [Spillane Aff.], Ex. 2 at 3

[Klawiter Aff.].)

   Defendant counters this business reason is implausible.  (*See* Def.'s Reply at 4–7.)

Defendant rests its argument largely on the Operating Agreement between Crystal River and

Plaintiff.  Title X of the Operating Agreement, entitled "Claims and Liabilities" reads in relevant

part:

> Operator may settle any single uninsured third party damage claim or suit arising
> from operations hereunder if the expenditure does not exceed [$5,000] and if the
> payment is in complete settlement of such claim or suit.  If the amount required for
> settlement exceeds the above amount, the [owners] hereto shall assume and take
> over the further handling of the claim or suit, unless such authority is delegated to
> Operator.  All costs and expenses of handling, settling or otherwise discharging
> such claim or suit shall be at the joint expense of the parties participating in the
> operation from which the claim or suit arises.

(*Id*, Ex. 1 at 16 [Operating Agreement].)  Defendant avers that Plaintiff's asserted business reason

for the assignment is not supported by the Operating Agreement and that the assignment was in

fact in deviation from the agreement.  (*Id.* at 4–7.)  Specifically, Defendant explains that contrary

to Plaintiff's actions, the Operating Agreement: (1) requires that costs and expenses of the

litigation be shared; (2) does not require Crystal River to assign its claims; and (3) has nothing to

do with Plaintiff's exposure, but instead has to do with the amount to settle the claim.  (*Id.* at

4–5.)

      At the outset, the court notes that it is not even clear that Title X of the Operating

Agreement is applicable to Crystal River's claims against Defendant, because the clause is limited

to suits against an "*uninsured* third party."  (*Id.*, Ex. 1 at 16 [Operating Agreement] [emphasis

added].)  Here, there is no evidence before the court that Defendant is or is not insured; thus, the

relevance of this clause is unclear.  Moreover, Plaintiff does not claim that the assignment in this

case was executed in compliance with a specific clause of the Operating Agreement.  Instead, the

owner of Crystal River explains that, "[i]n keeping with Crystal River's day-to-day operational

duties, the owners gave Crystal River the authority to pursue litigation on their behalves with

exposure that did not exceed $10,000.  In the event that the exposure of the lawsuit exceeded

$10,000, however, we agreed that the owners would take the matter in hand and litigate the

matters themselves."  (Pl.'s Resp., Ex. 1 at 3 [Spillane Aff.].)  It seems plausible to this court that

given the nature of Crystal River's claims against Defendant—that Defendant dug a well 180

degrees in the wrong direction—that both Plaintiff and Crystal River would have expected

Defendant to submit to a default judgment against it.  It also seems plausible that Plaintiff, as

majority owner of the Project, would allow Crystal River to pursue a simple default judgment

with low exposure vis-`a-vis litigation costs, but would want control of the litigation of the claim if Defendant decided to fight.

Even if the Operating Agreement does apply to the claims at issue, Defendant's arguments are unavailing.  First, although it is true that the Operating Agreement does not explicitly require Crystal River to assign its claims in excess of $5,000, it does state that the owners "shall assume and take over the further handling of the claim or suit, unless such authority is delegated to the Operator."  (Def.'s Reply, Ex. 1 at 16 [Operating Agreement].)  Contrary to Defendant's conclusory contention otherwise, I find that the words "assume" and "take over" contemplate the possibility of assignment of Crystal River's claims regarding the Project to Plaintiff.   (*See id.* at 4–5.)  Second, regarding the reference in the clause to Crystal River and the owners of the Project sharing litigation expenses, the parties' choice to deviate from this in consideration for Crystal River's complete assignment of its claims to Plaintiff simply does not suggest collusion.  Consideration for an assignment, in fact, suggests just the opposite.  Defendant's third argument that the Operating Agreement has nothing to do with Plaintiff's exposure, but instead has to do with the settlement amount is also unpersuasive.  Although the clause does refer to settling claims, it also refers to Crystal River's right to litigate certain "suit[s] arising from operations hereunder;" thus, it seems the agreement does contemplate the possibility of Crystal River engaging in litigation.  (*See id.*, Ex. 1 at 16 [Operating Agreement].)  Also, the clause may reasonably be read as limiting Crystal River's rights to pursue litigation or settlement when the potential litigation costs would be less than $5,000.  (*See id.* [permitting Crystal River to engage in certain litigation and settlement "if the expenditure does not exceed [$5,000]"].)  It is utterly plausible that the

owners of the Project chose to limit the operator's ability to litigate by the amount of exposure the owners faced.  Considering my findings, Plaintiff and Crystal River deviated from the Operating Agreement only insofar as Plaintiff allegedly permitted Crystal River to pursue litigation that could expose the owners to up to $10,000.  This single deviation is simply insufficient to support a finding of a collusive motive.

This is not to say that Defendant has not presented a persuasive, common-sense argument, supported by circumstantial evidence, that the assignment was motivated, at least in part, by the desire to gain a federal forum for the dispute.  As Defendant explains, when one views the entire history of this case:

> It appears most likely to [D]efendant that Crystal River initially brought this action in federal court and did not include [Plaintiff], in spite of the fact that [Plaintiff] is allegedly the owner of the [Project], because Crystal River and [Plaintiff] at the time believed that [D]efendant was a Texas limited liability company.  Inclusion of [Plaintiff], a Texas corporation, would therefore have destroyed diversity, or so Crystal River and [P]laintiff thought.  When it transpired that defendant is in fact a Colorado citizen due to the residence of its sole member, Crystal River assigned its claims to [Plaintiff].  That, not the Operating Agreement, explains [P]laintiff's conduct in this case.

(*Id.* at 5–6 [citations omitted].)  I find this explanation plausible, suggesting that at least one motivation behind the assignment was gaining a federal forum.  Nevertheless, it is not clear to this court that obtaining a federal forum was the sole, or even primary, motivation behind the assignment at issue.  When engaging in protracted and expensive litigation, it makes sense that the party who faces the greatest financial risk would seek total control over the litigation.[10]  Because

---

[10]Two points are worth noting here.  First, the evidence suggests that if Plaintiff was ever strongly motivated by its desire to maintain a federal forum, it was when Plaintiff permitted the

of the persuasive arguments on both sides regarding the Plaintiff's motive, my weighing of this factor is a wash.  I find the factor does not militate strongly in favor of or against a finding of collusiveness.

> **(6)      Whether the Timing of the Assignment Supports an Inference that the Assignment was not Entered into to Create Diversity.**

In their section 1359 analysis, several courts have considered whether the timing of a diversity-creating assignment suggests the underlying motive for the assignment was to establish diversity.  *See, e.g.*, *Nike*, 20 F.3d at 992 (finding the timing of the assignment, only three days before filing of the action in federal court suggested collusion); *Airlines Reporting*, 58 F.3d at 864 (finding the timing of assignment cast doubt on the asserted business reasons for the assignment). In the instant case, the assignment occurred the same day as the dismissal of Crystal River's action against Defendant and the filing of Plaintiff's complaint.  (*See* Pl.'s Resp., Ex. 1 at 7 [Assignment of Claim]; Stipulated Dismissal with Prejudice [filed July 28, 2006]; Compl.) Defendant argues this is proof positive that the sole motivation behind the assignment was to secure a federal forum.  (Def.'s Br. at 6.)  Plaintiff counters it was utterly reasonable for it to act

---

operator of its project to initially file suit for a claim exceeding $75,000 against Defendant, rather than insisting on litigating the claim itself.  This issue, however, is not before the court.  Even if it were, because it does not involve a transfer or assignment of claims, it could not conceivably be violative of § 1359.

Second, although also not before the court, it is worth noting that there is some evidence that RMS may have assigned its claims to Plaintiff for the sole purpose of establishing diversity. If this were so, even this assignment may well be proper under § 1359, because "[w]here multiple parties have a financial interest in a lawsuit, a strategic choice of parties in order to maintain diversity is not considered to be collusive so long as the party chosen to bring the suit is in fact the master of the litigation."  *Oscar Gruss*, 337 F.3d at 195 (internal quotations omitted).

quickly after dismissal of Crystal River's claims without prejudice.  (Pl.'s Resp. at 14.)  If

Plaintiff's rationale for the assignment, discussed above, is to be believed, then the timing of the

assignment does not necessarily suggest collusion.  (*See Analysis* § 2[a][v][5], *supra*.)  If Plaintiff

was truly surprised by Defendant's unwillingness to accept a default judgment, and therefore

Plaintiff decided it needed to take control over the litigation, the timing of the assignment is

perfectly explicable, even absent any desire to secure a federal forum.  (*See id.*)  If Defendant's

similarly plausible explanation of Plaintiff's motive behind the assignment is to be believed, then

the timing of the assignment simply shores up the explanation.  (*See id.*)  I find the timing of the

assignment shows evidence of a dual motive, but cannot say with any certainty that Plaintiff

would not have sought assignment of Crystal River's claims absent the likelihood of gaining a

federal forum.  (*See id.*)  Again, considering the strong arguments on both sides, I find this factor

does not weigh strongly in favor or against a finding of collusion.

### *(7)     Totality of the Circumstances*

Viewing these factors under the totality of the circumstances, I find the assignment of

claims from Crystal River to Plaintiff was not collusive in violation of section 1359.  No factors

strongly suggest that the assignment was collusive.  Even if I had found that the underlying

motive and timing of the assignment revealed the primary purpose behind the assignment as

securing a federal forum, my decision here would be unaffected.  As discussed above, subjective

inquiries into motive are of secondary in this circuit to objective inquiries into whether real and

substantial parties to the controversy are before the court and the reality of the transaction itself.

(*See Analysis* § 2[a][iii], *supra*.)  Each of the objective factors analyzed here strongly suggest that

Plaintiff is a real and substantial party to the controversy.  As majority owner of the Project, Plaintiff has the largest preexisting financial interest of any other entity (besides Defendant) in the outcome of the litigation.  Plaintiff's willingness to fund and control the litigation only serves to shore up this finding.   Further, analysis of the factors show that the assignment appears to be "real" on every front—meaningful consideration was given for the assignment and Crystal River has on paper and in reality relinquished all rights to proceeds from the claim.  Based on the totality of the circumstances, I find the assignment at issue does not violate § 1359, regardless of the motivation behind the assignment.[11]

This holding is not in conflict with the purpose behind section 1359, as the exercise of federal jurisdiction in this case does not "inappropriately channel ordinary business litigation into the federal courts.'" *Amoco*, 7 F.3d at 916 (quoting *Yokeno*, 973 F.2d at 809); *see Kramer*, 394 U.S. at 828–29.  Instead, the court is faced with a dispute over in excess of $75,000, in which the party with the greatest financial stake in the outcome of the litigation is diverse from the defendant.  This is exactly the type of case 28 U.S.C. § 1332, the statute which establishes diversity jurisdiction, makes clear is within the jurisdiction of federal courts.  *See* 28 U.S.C. § 1332 (2006).

### b.       *Crystal River as an Indispensable Party*

---

[11]I recognize that a court purporting to champion motive over all other factors may well have found this assignment collusive.  Even so, this court's careful research has yet to reveal a case finding a violation of § 1359 when: (1) the assignment was complete and absolute; (2) meaningful consideration exchanged hands; (3) the assignor gave up all rights to litigation proceeds; and (4) the assignee had a preexisting interest in outcome of litigation.

Even if the assignment at issue is not in violation of section 1359, Defendant argues that Crystal River is an indispensable party that cannot be joined in the lawsuit without destroying diversity, and that, therefore, this court must dismiss the action.  (Def.'s Br. at 6–10.)  Specifically, Defendant claims Crystal River is an indispensable party because: (1) Plaintiff may proceed with this litigation in an alternate forum, namely state court; (2) failure to join may expose Defendant to inconsistent judgments against it; (3) failure to join Crystal River wastes judicial resources; and (4) Crystal River may be prejudiced by resolution of the contract issues in this case in its absence.  (*Id.* at 8–9.)  Plaintiff counters that Crystal River is not an indispensable party because: (1) Crystal River's absence will not prevent complete relief between Plaintiff and Defendant; (2) Crystal River has expressly disclaimed all interest in any action against Defendant arising from the Project; and (3) Crystal River's absence does not put Defendant at the risk of incurring multiple or otherwise inconsistent obligations.  (Pl.'s Resp. at 4–9.)

Federal Rule of Civil Procedure 19 requires the district court to perform a two-step process before dismissing a claim for failure to join an indispensable party.  *Davis v. United States*, 343 F.3d 1282, 1288–89 (10th Cir. 2003).  First, the court must determine whether the party is "necessary."  *See* Fed. R. Civ. P. 19(a) (2006).  A party is necessary and should be joined in the action if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impeded the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk

-37-

of incurring double, multiple, or otherwise inconsistent obligations by reason of the
claimed interest.

*Id.* The Supreme Court has described these factors as representing four distinct interests:

> (1) "the interest of the outsider whom it would have been desirable to join[;]" (2) the
> interest of the defendant in avoiding "multiple litigation, . . . inconsistent relief, or sole
> responsibility for a liability he shares with another[;]" (3) "the interest of the courts and
> the public in complete, consistent, and efficient settlement of controversies[, and] . . .
> settling disputes by wholes, whenever possible[;]" and (4) the plaintiff's interest in having
> a forum in which to present the claims . . . .

*Davis*, 343 F.3d at 1290 (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390

U.S. 102, 109–11 [1968]).

If the party is necessary, but cannot be joined, the court must determine whether the party

is indispensable, thus requiring dismissal of the suit. *Rishell v. Jane Phillips Episcopal Mem'l*

*Med. Ctr.*, 94 F.3d 1407, 1410 (10th Cir. 1996). "The standards set out in Rule 19 . . . are to be

applied 'in a practical and pragmatic but equitable manner.'" *Id.*, 94 F.3d at 1410 (quoting

*Francis Oil & Gas, Inc. v. Exxon Corp.*, 661 F.2d 873, 878 [10th Cir. 1981]). Moreover, unlike

for the jurisdictional question discussed above, the moving party has the burden of persuasion in

arguing for dismissal. *Id.* I address the *Davis* factors in turn.

### i.     *The Interest of the Outsider*

Defendant conclusorily avers that "Crystal River may be prejudiced by resolution of the contract issues in this case in its absence." (Def.'s Br. at 9.) Plaintiff counters that because Crystal River incurred no debts or liabilities from the Project, it has not been harmed by Defendant's negligence. (Pl.'s Resp. at 6.) I find that based on the claims presently before the court, Crystal River has no substantial stake in the outcome of this litigation, and thus cannot be prejudiced by exclusion.

According to uncontested affidavits submitted by Plaintiff, Crystal River had no ownership interest in and in no way financed the Project. (*See* Pl.'s Resp., Ex. 1 at 1–2 [Spillane Aff.], Ex. 2 at 1–2 [Klawiter Aff.].) Thus Crystal River has no financial interest in the outcome of the litigation. Whatever non-financial interest Crystal River may have—for instance, an interest as operator of the Project in making the owners of the Project whole—is well protected by Plaintiff, as this court has every reason to believe that Plaintiff is motivated by the very stance of the suit to make Crystal River's arguments, because it is those arguments that could potentially make Plaintiff whole. (*See id.* at 7–8.) In reality, as Plaintiff points out, Crystal River's arguments are Plaintiff's arguments. (*Id.* at 7.) "Had Crystal River prosecuted the claims against [Defendant], it would be litigating the owner's interests, not its own." (*Id.*) Based on the foregoing, I find Crystal River will not be prejudiced by its absence as a party to the suit.

### ii.     Defendant's Interest in Avoiding Multiple Litigation, Inconsistent Relief, or Sole Responsibility for what is Actually a Shared Liability

Defendant claims failure to join Crystal River may result in multiple litigation with the potential for inconsistent outcomes.  (Def.'s Br. at 8.)  First, Defendant claims that without Crystal River as a party, Defendant it is left vulnerable to a lawsuit by Crystal River on the basis of the contract between Defendant and Crystal River, which has not been assigned to Plaintiff. (*Id.*)  Plaintiff argues the assignment renders "this case . . . the single opportunity that Crystal River, RMS, and [Plaintiff] will have to seek relief from [Defendant]."  (Pl.'s Resp. at 9.)  I agree with Plaintiff.  Based on the plain language of the assignment, Crystal River has conveyed its right to sue Defendant regarding the Project.[12]  (*Id.*, Ex. 1 at 5–6 [Assignment of Claim].)  Indeed, on its face, the assignment states that Crystal River has "irrevocably and forever s[old], transfer[red], convey[ed], and assign[ed] to [Plaintiff] any . . . right title or interest" in "all of Crystal River's legal claims which may arise [regarding the Project], including without limitation claims against [Defendant]."  (*Id.*)  The law is clear that as an assignor who has transferred all interest in its claims against Defendant, Crystal River forfeited its right to sue Defendant on those claims. MOORE, *supra*, § 17.11[1][a] ("Because it has assigned the entire claim, the assignor retains no interest on which to base an action."); *see Hefley v. Jones*, 687 F.2d 1383, 1387–88 (10th Cir. 1982) (finding that upon assignment of all rights in contract, assignees became sole parties capable of bringing suit).  Thus, any claims that could have been asserted by Crystal River against

---

[12]The court notes that the legality of the assignment is not at issue in this case.  The only question before the court regarding the assignment is whether it was collusive and thus in violation of section 1359.  I have already determined the assignment was not collusive, and I am operating under the assumption that the assignment was legal.

Defendant can now *only* be asserted by Plaintiff, as assignee of those claims.  Defendant,

therefore, cannot be subject to an additional lawsuit by Crystal River regarding the subject matter

of the instant lawsuit.

Second, Defendant argues Crystal River's absence will subject Defendant to the possibility

of inconsistent legal obligations and multiple litigation, because it plans to assert a claim against

Crystal River on the basis of breach of contract.  (Def.'s Br. at 8.)  Defendant opines that it will

not be able to assert its claim against Crystal River in the present action and will thus be forced to

pursue its claim in state court, which may result in inconsistent legal obligations and will certainly

result in multiple litigation.  (*Id.*)

Defendant's argument is disingenuous.  Based on the evidence before the court at this

point in time, I see no barrier that is likely to prevent Defendant from bringing a third-party claim

against Crystal River in this lawsuit, even if this court finds Crystal River is not a necessary party.

Federal Rule of Civil Procedure 14 allows that "a defending party, as a third-party plaintiff, may

cause a complaint to be served upon a person not a party to the action who is or may be liable to

the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff."  Fed.

R. Civ. P. 14 (2006).  Although Crystal River is a non-diverse party, "a federal district court has

supplemental jurisdiction over a defendant's proper Rule 14(a) claim against a third-party

defendant without regard to whether an independent basis of jurisdiction exists, as long as the

court has jurisdiction over the main claim between the original parties."[13] MOORE, *supra*, §

106.42[1]; *King Fisher Marine Serv., Inc. v. 21st Phoenix Corp.*, 893 F.2d 1155, 1161 (10th Cir.

1990) (defendant's claim against non-diverse third-party defendant is within court's ancillary

jurisdiction).  Because there appears to be no bar to Defendant asserting a third-party claim

against Crystal River, I find the possibility that Defendant will be subject to multiple litigation or

inconsistent judgments insubstantial.[14]

     *iii.*    **Efficiency Concerns**

     Rule 19 evinces a preference for judicial efficiency, which includes "settling disputes by

wholes, whenever possible."  *Provident Tradesmens*, 390 U.S. at 111; Fed. R. Civ. P. 19 (2006).

Defendant's argument that failure to join Crystal River as a party wastes judicial resources is

moot considering my finding that there appears no barrier to Defendant bringing a third-party

claim against Crystal River.  (*See* Def.'s Br. at 9; *Analysis* § 2[b][ii].)  Here, because I have

---

    [13]Although the exercise of supplemental jurisdiction is discretionary, the evidence before the court at this point does not suggest that any of the exceptions that might lead this court to decline to exercise supplemental jurisdiction in the instant action.  *See* 28 U.S.C. § 1367(c) (2006) (stating "district courts may decline to exercise supplemental jurisdiction" if: "(1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; (4) in exceptional circumstances, where there are other compelling reasons for declining jurisdiction").

    [14]Defendant also argues that if this court permits a third-party claim against Crystal River, the court would have a duty to "'look beyond the pleadings and arrange the parties according to their sides of the dispute,'" ultimately realigning Crystal River as a Plaintiff, thus destroying diversity.  (Def.'s Br. at 8–9 [quoting *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 69 (1941)].)  Defendant's argument is unavailing, because, as discussed above, Crystal River has no right to assert claims regarding the Project against Defendant, and thus cannot not be realigned as a plaintiff.

already determined that it is unlikely Defendant will face a barrier to impleading Crystal River as a third-party defendant, so long as Defendant chooses to bring its claim in federal court, it is very likely that the subject matter of this dispute may be dealt with as a whole.

### iv.   Plaintiff's Interest in Preferred Forum

Plaintiff's interest in retaining his preferred forum is the final concern the Supreme Court understood Rule 19 to emphasize.  Clearly this consideration weighs in favor of Plaintiff's choice of a federal forum.  Defendant offers no arguments that counsel against this finding.

Based on consideration of all of the above factors, I find Crystal River is not a necessary party to this action and therefore need not consider whether Crystal River is an indispensable party.

### 3.   Conclusion

Based on the foregoing it is therefore ORDERED that Defendants' motion (# 5) to dismiss is DENIED.

Dated this 15th day of November, 2006.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge